**MICHAEL L. BROWN**
**Law Office of Michael L. Brown**
222 North Court
Tucson, Arizona
85701
Ph. (520)322-8180
mlbrownlaw@gmail.com
Attorney No. 016399
Attorney for Defendant Hernandez

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States,<br><br>Plaintiff,<br><br>vs.<br><br>Geovany Emmanuel Hernandez,<br><br>Defendant. | CR22-01856-JGZ<br><br>**OBJECTION TO PRESENTENCE INVESTIGATION REPORT**<br><br>(Honorable Jennifer G. Zipps) |

The Defendant, Geovany Emmanuel Hernandez, ("Mr. Hernandez" or "Geovany") submits the following Objection to the Presentence Investigation Report based upon the following Memorandum of Points and Authorities.

**Synopsis**

The Presentence Investigation Report ("PSR") asks the Court to apply a 3-level upward adjustment to Mr. Hernandez's Sentencing Guidelines under U.S.S.G. §3B1.1(b) claiming that Mr. Hernandez acted as a manager or supervisor in the alleged criminal activity. (see *PSR* at ¶ 36, 46) Mr. Hernandez asserts that he absolutely did not act in the role as a manager or supervisor and that there is neither reliable nor sufficient factual nor legal support for such an finding. The Court must sustain the objection and the order the PSR revised accordingly.



*MICHAEL L. BROWN*
*222 North Court*
**Tucson, Arizona 857o1**
**520-322-8180 /Fax No. 318-0201**

*MICHAEL L. BROWN*
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

Mr. Hernandez further objects to the PSR recommending a 4-level increase for the "Specific Offense Characteristics," asserting that the Mr. Hernandez is responsible for "the purchase of 24 firearms under USSG 2K2.1(b)(1)(B)". (see *PSR* at ¶ 44). Mr. Hernandez objects to this proposed adjustment as the case facts and as expressly described in the factual basis of the plea agreement, Mr. Hernandez was only present and only had knowledge of the purchase of six firearms by various other co-defendants. The Court must sustain the objection and the order the PSR revised accordingly.

Mr. Hernandez pled guilty under a plea agreement ("Plea Agreement") to a charge of Aiding and Abetting the Commission of Making False Statements in Connection with the Purchase of Firearms. *(dkt 124).* Per the Plea Agreement, the "Agreements Regarding Sentence" and "Guideline Calculations" sections state that the "parties stipulate and agree that the below guideline calculations are appropriate for the charge for which the defendant is pleading guilty *Id*.:

| | | |
|---|---|---|
| Base Offense level: | 2K2.1(a)(7) | 12 |
| Number of Firearms: | 2k2.1(b)(1)(A) | +2 |
| *Aggravating Role* | *3B1.1(b)* | *+3/0* |
| Acceptance of Responsibility: | 3E1.1(a)&(b) | -3/-2 |
| Total Adjusted Offense Level: | | 14/12 |

The Plea Agreement made clear that the issues of whether an aggravating role applied or did not apply in Mr. Hernandez's case was to be determined by the Court at sentencing, due to some contested issues. However, the Plea Agreement also made clear that the Parties agreed that Mr. Hernandez should not face a 4-level enhancement based upon the total number of firearm's purchased by the various co-defendants because Mr. Hernandez was neither present nor had knowledge of all of the alleged purchases or the related activity of the various co-defendants.

## Memorandum of Points and Authorities

### I. General Factual Background:

The Indictment is replete with significant factual errors in the assertion of allegations against

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

Mr. Hernandez and specifically, errors regarding Mr. Hernandez's level of involvement and lack of knowledge of the majority of the firearms purchases. For example, the Indictment falsely claims that Mr. Hernandez aided and abetted, funded and had knowledge of every firearms purchase alleged in Counts 1-23. However, upon the parties (the defense and the government), further investigation and understanding of the case, the government conceded that Mr. Hernandez was only involved and had knowledge of the firearms purchases alleged in Counts 3, 4, 9, 16 and 23 and further, there was no evidence to support that Mr. Hernandez funded the purchase of the weapons in these counts, nor in any other count.

As such, the factual basis of the Plea Agreement contains the specific information upon which this Court must base the evaluation of Mr. Hernandez's alleged role, knowledge and involvement in this case. Per the factual basis, which is the negotiated understanding and agreement of the parties, Mr. Hernandez was involved with and had knowledge of the following firearms purchases:

1. February 5, 2022: 1 Century Arms VSKA 7.62x39 mm rifle; 1 Pioneer Arms Sporter AK-47 7.62×39 m rifle; 1 Century Arms VSKA 7.62x39 m rifle
2. February 8, 2022: 1 Century Arms VSKA 7.62x39 mm rifle
3. February 19, 2022: 1 Palmetto State Armory PSAK-47 M4 7.62x39 mm rifle
4. May 27, 2022: 1 Century Arms BFT47 7.62×39 mm rifle

Contrary to the bare assertions in the Indictment, Mr. Hernandez was not involved with nor did he have any knowledge of the firearms purchases made by the co-defendants, alleged in Counts, 2, 5-8, 10-15, 17-22.

## II. Specific Offense Conduct Factual Background

Based upon information and belief, the impetus for the alleged offense conduct began with co-defendant Ramon Francisco Zambrano (hereinafter, "Zambrano") (co-def 1) and with co-

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

defendant Ramon Baltazar Zambrano Marquez (hereinafter, "Zambrano Marquez") (co-def 2). Zambrano and Zambrano Marquez had a mutual friend, Guero who regularly supplied them drugs. On an occasion in late January 2022, Zambrano and Zambrano Marquez were at the Tucson racetrack when Guero introduced them to an individual named Juan Garcia (hereinafter "Garcia"). As was explained to Mr. Hernandez, Garcia propositioned and recruited Zambrano to make some "easy" money by buying weapons for Garcia. Garcia wanted Zambrano and any of his friends to purchase certain type weapons for him and upon delivery, Garcia would reimburse the cost of the weapon and pay $300-$400 per weapon.

Subsequently, Zambrano approached all of the co-defendants including Mr. Hernandez about Garcia's recruitment. With respect to Mr. Hernandez, he is a little older than the Zambrano brother's and they have been friends for a long time. Zambrano was a gun enthusiast but new to the activity based upon his age. Zambrano knew that Mr. Hernandez was also a gun enthusiast and that Mr. Hernandez had legally bought firearms in the past. Zambrano and Mr. Hernandez and some of the other co-defendants had gotten together to go target shooting in the past. In this instance, Zambrano wanted some opinion from Mr. Hernandez about the Garcia proposition and Zambrano working with Garcia. A fact likely unknown to the government was that Zambrano further told Mr. Hernandez that Garcia had asked Zambrano about the purchase of more than just AK47's, but 50 caliber rifles, M249's and whether Zambrano could find a grenade launcher. Candidly, Mr. Hernandez fervently told Zambrano that was "crazy" and that beyond the incredible upfront cost of a 50-caliber rifle (more than $10,000), why was Garcia not purchasing these weapons on his own, if he had the money to pay for them. Mr. Hernandez strongly discouraged Zambrano from getting involved with the purchase of anything of that type. Zambrano indicated that he was very interested in making some "easy" money buying legal weapons and "reselling" them to Garcia for the profit Garcia was offering.

*MICHAEL L. BROWN*
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

On February 1, 2022, Zambrano and Mr. Hernandez went to Brady's Firearm's together. Zambrano purchased an AK47 style rifle, with his own monies. Mr. Hernandez went along for his own separate purposes. Zambrano told Mr. Hernandez that he was purchasing it for his own use and to go shooting with him out in the desert or at the range. Mr. Hernandez had nothing to do with the purchase of this weapon nor did he supply any money to assist with the purchase. There was no discussion that Zambrano was actually or potentially purchasing the weapon to resell to Garcia.

A few days later, Zambrano contacted Mr. Hernandez and during their conversation, Zambrano indicated that he wanted to get involved with Garcia. In fact, Zambrano indicated that he had already sold the weapon he purchased on February 1, 2022 to Garcia – all unbeknownst to Mr. Hernandez.

As Mr. Hernandez candidly admitted during the PSR interview, it was at this time that Zambrano asked Mr. Hernandez to lend him some money so that he could purchase another weapon for Garcia. Mr. Hernandez had recently gotten his tax refund. Mr. Hernandez gave Zambrano approximately $1200. Zambrano said he would pay Mr. Hernandez back and maybe a little extra. Mr. Zambrano did not ask for anything to be paid to him other than his monies coming back to him. That said, Mr. Hernandez did not object to making a few hundred dollars for loaning the funds. Zambrano also indicated that he had told his friend, Alan Martinez-Marquez (hereinafter, "Marquez") about the Garcia deal and Marquez wanted in.

On February 5, 2022, Zambrano, Marquez and Mr. Hernandez went to the Sportsman's outdoor store. Zambrano bought two AK47 type weapons and Marquez bought one weapon. Mr. Hernandez was present for a couple of reasons. Mr. Hernandez was a gun enthusiast, and he was interested in what was going on. Second, Mr. Hernandez was the only one of the three of them that had a car and Zambrano had asked him to give them a ride/use his car to go to the gun store. Contrary to the reports and the PSR restatements, Zambrano took possession of all three weapons

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

when he was dropped off by Mr. Hernandez. Both Marquez and Mr. Hernandez told Zambrano that they could not store the weapons at either of their houses, as their significant others or parents would object. Zambrano confirmed to law enforcement that Mr. Hernandez had used his car to transport him, but never indicated that Mr. Hernandez was involved with Garcia. These facts are the basis for Count 3 and Count 17 of the Indictment.

Subsequently, Zambrano called Mr. Hernandez either the next day or day after that and told Mr. Hernandez that he had already given the guns to Garcia and been paid. Zambrano also told Mr. Hernandez that he had already gone out and bought another weapon and "resold" it to Garcia. This was all a surprise to Mr. Hernandez. These facts are the basis for Count 4 of the Indictment.

Between February 7, 2022 and February 12, 2022, Zambrano at times with Marquez and co-defendant Fernando Carrillo Jr. (hereinafter, "Carrillo"), and at times by himself purchased seven more AK47 type weapons from various gun stores around Tucson. With the exception of February 8, 2022, Mr. Hernandez had no idea or information that Zambrano and Marquez had made more purchases. Mr. Hernandez never took possession of these weapons and Zambrano was acting on his own and was presumably dealing with Garcia on his own. These facts are the basis for Count 5-8 and 23 of the Indictment.

On February 10, 2022, Marquez purchased two AK47 type weapons from two federally licensed firearm's dealers. Presumably Marquez was acting on his own or under the direction of Zambrano. Mr. Hernandez did not provide any funds for this purchase and never took possession of this weapon. This purchase was done without Mr. Hernandez's knowledge or involvement. These facts are the basis for Count 18-19 of the Indictment.

On February 12, 2022, Zambrano Marquez purchased two AK47 type firearms from two separate federally licensed firearm's dealers in Arizona. Presumably Zambrano Marquez was acting on his own or under the direction of Zambrano. Mr. Hernandez did not provide any funds for this

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

purchase and never took possession of this weapon. This purchase was done without Mr. Hernandez's knowledge or involvement. These facts are the basis for Count 14-15 of the Indictment.

On February 12, 2022, Marquez purchased three AK47 type weapons from three separate federally licensed firearm's dealers. Marquez was acting on his own or presumably under the direction of Zambrano. Mr. Hernandez did not provide any funds for this purchase and never took possession of this weapon. This purchase was done without Mr. Hernandez's knowledge or involvement. These facts are the basis for Count 20-22 of the Indictment.

Again and candidly, while Mr. Hernandez does not recall when Zambrano returned his $1200, he believes that Zambrano did so within two or three weeks of taking the initial loan in early February. Further, Mr. Hernandez indicates that when Zambrano paid him back, Zambrano gave him an additional $300.00. This $300 was the sum-total of all the monies Mr. Hernandez received for doing anything related to the purchase of any weapons outlined in the Indictment.

On February 19, 2022, Zambrano, Zambrano Marquez, Marquez and Mr. Hernandez went to a gun show together. The only person to purchase a weapon was Zambrano. Mr. Hernandez had no involvement or role with this purchase. Mr. Hernandez never took possession of this weapon. Mr. Hernandez pled to his involvement as aiding or abetting because he was present and he knew or had reason to know that Zambrano was going to resell the weapon to Garcia. These facts are the basis for Count 9 of the Indictment.

On February 20, 2022, Zambrano traveled to Phoenix and purchased an AK47 type firearm from a federally licensed firearm's dealer. Mr. Hernandez had no idea or information that Zambrano planned to or made this purchase. Zambrano was acting on his own and was presumably dealing with Garcia on his own. Mr. Hernandez never took possession of this weapon. This purchase was done without Mr. Hernandez's knowledge or involvement. These facts are the basis for Count 10 of

*MICHAEL L. BROWN*
*222 North Court*
**Tucson, Arizona 857o1**
**520-322-8180 /Fax No. 318-0201**

the Indictment.

On May 24, 2022, Zambrano traveled to Phoenix and purchased three AK47 type firearm from three separate federally licensed firearm's dealers in the Phoenix area. Mr. Hernandez had no idea or information that Zambrano planned to or made these purchases. Zambrano was acting on his own and was presumably dealing with Garcia on his own. Mr. Hernandez never took possession of this weapon. This purchase was done without Mr. Hernandez's knowledge or involvement. These facts are the basis for Count 11-13 of the Indictment.

On May 27, 2022, Zambrano Marquez went to Tactical Studio's LLC in Tucson which is a federally licensed firearm's dealer. Zambrano Marquez bought one AK47 type weapon. Mr. Hernandez was present but did not participate in any way in the purchase of the weapon. Mr. Hernandez did not give Zambrano Marquez any instructions nor any funds, nor did he ever take possession of the weapon. Mr. Zambrano Marquez stated to law enforcement that Mr. Hernandez was not involved. Based upon information and belief, Zambrano Marquez was operating on his own behalf and/or at the instruction of his brother, Zambrano. However, Mr. Hernandez knew or had reason to know that the weapon would be transferred or sold to Garcia by Zambrano or Zambrano Marquez. These facts are the basis for Count 16 of the Indictment.

According to the PSR, the case agent added that it was his belief that Mr. Hernandez was providing money for the straw purchasers, but also indicated that Zambrano was the most culpable. It is important to note that Mr. Hernandez was the only defendant not interviewed by law enforcement. Mr. Hernandez made an offer to explain his involvement and that of other co-defendants to the government that was rejected. Multiple requests were made of the government to provide information about the organizer, Juan Garcia, but the government ignored and/or refused all requests for information on Garcia. This despite the fact that Zambrano clearly identified Garcia in his statements and provided a local address and other identifying information to law enforcement.

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

**III. Legal Argument**

The PSR contends that pursuant to U.S.S.G. §3B1.1(b) Mr. Hernandez was a manger or supervisor of all of the criminal activity alleged in the Indictment. (see *PSR* at ¶ 36, 46). As such, the PSR assigns a three-level upward adjustment in Mr. Hernandez's Sentencing Guidelines. *Id*.

The Commentary Application Notes for U.S.S.G. §3B1.1 state that the Court should evaluate the following factors: (1) the nature of the participation in the commission of the offense, (2) the recruitment of accomplices, (3) the claimed right to a larger share of the fruits of the crime, (4) the degree of participation in planning or organizing the offense, (5) the nature and scope of the illegal activity and the degree of control exercised over others. Using the Commentary Application Notes as a Guide it is easy to flush out that this enhancement is not supported by the facts or applicable law.

It is surprising that the PSR concludes that Mr. Hernandez had complete knowledge of the entire conspiracy. (see *PSR* at ¶ 36). It is unclear what actual and/or reliable factual support this is based upon, beyond the purported conclusions of the case agent. There are no financial records that show where or how Mr. Hernandez came up with the money to fund all of these purchases. Mr. Hernandez was unemployed at this particular time. There are no telephone or other communication records that support any such claim. There is little to no other documentation of Mr. Hernandez's presence on a few, as in four instances, much more his participation or organization of anything beyond the cobbled together and potentially coerced or forced statements of two of the four co-defendants, that are only presented in the summarized report of the case agent and not their own words or voice. Further, if you analyze the statements/involvement of those two co-defendant's, Marquez and Carrillo, they were not present or not involved except for limited situations. For Carrillo, he was only present once and he was admittedly recruited by Zambrano. For Marquez, his statements are not clear or supported by the disclosure of his actual statements. We are left to take

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

the case agent at his word as to Marquez's exact words. Further, Marquez is a relative of the Zambrano brothers and had incentive and motive to try to put the blame on Mr. Hernandez as opposed to the Zambrano's, who considered as brothers. Further still, there is no evidence that Mr. Hernandez recruited anyone. The common tie between all of the people is - Zambrano. Zambrano recruited Marquez, his brother and Carrillo, and Mr. Hernandez, not the other way around. There is absolutely no evidence that Mr. Hernandez had dealings with or exchanged money with Garcia. In fact, the opposite is true, and it was clear that Zambrano was recruited by Garcia and dealt directly with Garcia. With respect to monies made, there is no evidence that Mr. Hernandez made anything, beyond his own statement during the PSR interview and that was $300.00. The people that were making money on this venture were Zambrano and then to a lesser extent Marquez and then Zambrano Marquez – everybody made money based on their individual purchases. Even Carrillo with only one purchase, made the same or more than Mr. Hernandez. It is an unsupported leap to claim that Mr. Hernandez was controlling, receiving, collecting or distributing any monies. With respect to organizing purchases, again, there is simply no requisite proof, just further leaps into thin air that Mr. Hernandez was coordinating and supervising weapons purchases for dates and incidents when he is not even present, not in the store, not filling out any documents, not collecting or providing any money and not meeting with Garcia. A critical look at the dates of the offenses, some being in February and then some in May, during a vacation trip taken by all five co-defendants, illuminates that there was no rhyme or reason to the purchases, no direction or organization other than information that everyone can readily find from telephone internet service – the location of the nearest gun shop and when you run out of gun stores in Tucson, the location of the nearest gun shops in the Phoenix area. There is no rhyme or reason or pattern to this case other than that there are likely more gun stores in Arizona, than schools or churches, and it is easier to buy a gun and resell it for a quick buck, legally or illegally, than to get an education or to have time to be a regular church-

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

goer.

What became clear from the investigation of the case and indictment allegations was that the case agents knew that Mr. Hernandez was not present for most of the transactions, and that he was not involved with or on the paperwork for any of those transactions. Wanting to believe that Mr. Hernandez had some role, any role for which they could charge him, a review of the police reports demonstrates that the case agents put significant pressure on the co-defendants in an attempt to inculpate Mr. Hernandez. Without some alleged statement of a co-defendant there was likely no case against Mr. Hernandez.

Even on the best day, the evidence against Mr. Hernandez that he allegedly funded, controlled/directed each co-defendant and was the ring-leader behind every purchase is just patently false and that the Indictment overwhelmingly contains reckless and unsupported allegations against Mr. Hernandez, made by the Assistant United States Attorney originally handling this case. At best, some of the co-defendants have given inconsistent, unreliable, incomplete and/or simply self-serving or cajoled statements about Mr. Hernandez's alleged involvement. Even under the best light and liberal construction, none of the co-defendants actually name or identify Mr. Hernandez as their manager or organizer, under any scrutiny or understanding of the facts. And with respect to the facts, it is clear that the circumstances or statements allegedly being used against Mr. Hernandez are still a mystery to the government and U.S. Probation.

Further, disclosure from the government regarding evidence related to the question of Mr. Hernandez's alleged involvement is still incomplete, missing or consists of an unintelligible audio file(s). There are reports from law enforcement that claim that some of the co-defendant's indicated that Mr. Hernandez provided money for the purchases and indicated where and how to buy the weapons. To the extent that any co-defendant made such a statement, the audio of that statement has not been disclosed or does not exist.

MICHAEL L. BROWN
222 North Court
Tucson, Arizona 857o1
520-322-8180 /Fax No. 318-0201

Using the above facts and factors, this Court can also address the proposed 4-level enhancement asserting that Mr. Hernandez is responsible for all of the weapons purchased. The facts and evidence do not tie Mr. Hernandez to knowledge and participation in the purchase of 24 weapons, especially when he did not actually purchase any of them and there is no evidence that he organized or ordered there purchase. Further, while counsel does not have access to the co-defendant's Guideline calculations done by U.S. Probation, counsel is left with the sense that only Mr. Hernandez was hit with the proposed 4-level enhancement here – maybe Zambrano as well. Even the government concluded and concurred that Mr. Hernandez was only responsible for the six weapons set forth in the conditions and factual basis of the Plea Agreement.

As the Ninth Circuit stated in *United States v. Valle*, 940 F.3d 473, 479 (9th Cir 2019), the burden of proof for a factual determination to support a sentencing enhancement depends on the "magnitude of the finding's effect on the sentencing range. As a general rule, a preponderance of the evidence standard applies but the Government must meet a higher standard-proof by "clear and convincing evidence" – in cases where there is "an extremely disproportionate impact on the sentence"." (Citing *United States v. Jordan,* 256 F.3d 922, 930 (9th Cir. 2001). In *Jordan*, the Court indicated that the clear and convincing standard applied where the proposed enhancement resulted in an increase of four or more offense levels and/or whether the length of the enhanced sentence more than doubled the length of the sentence as compared to the initial and un-enhanced sentencing guideline range, where the defendant would otherwise have received a relatively short sentence. *Jordan*, 256 F.3d at 928; See also, *United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000); *United States v. Gonzales*, 492 F.3d 1031, 1039-40 (9th Cir. 2007).

The PSR has recommended a combined 7-level enhancement to Mr. Hernandez's Sentencing Guidelines, a fact that would/could result in the doubling of his potential sentence, based upon essentially the same factual background. As such, this case requires proof of the enhancement by

*MICHAEL L. BROWN*
*222 North Court*
**Tucson, Arizona 857o1**
**520-322-8180 /Fax No. 318-0201**

clear and convincing evidence. This case and these alleged adjustments/enhancements cannot pass the clear and convincing hurdle. That said, even if the Court uses the preponderance test, the outcome must be the same, and the Objection herein must be sustained.

**Conclusion**

Taken together, there is simply a lack of evidence to prove by either clear and convincing or preponderance evidence to support the proposed aggravating role Adjustment and Specific Offense Characteristic enhancement. The Objection must be sustained and the PSR ordered revised accordingly.

**RESPECTFULLY SUBMITTED** this 8th day of March 2024.

LAW OFFICE OF MICHAEL L. BROWN

*s/ Michael L. Brown*

Michael L. Brown
Counsel for Defendant

Original of the foregoing filed
this date with the Clerk of the
U.S. District Court.

Matt Cassell
Craig Russell
Assistant United States Attorney

Christie Kirberger
United States Probation